*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

MARVELL CHRISTOPHER ELLIOTT,

      Defendant-Appellant.

UNPUBLISHED
November 14, 2025
10:35 AM

No. 369555
Wayne Circuit Court
LC No. 22-007585-01-FC

Before: RIORDAN, P.J., and WALLACE and TREBILCOCK, JJ.

PER CURIAM.

Defendant Marvell Christopher Elliott appeals as of right his convictions and sentences for second-degree murder, MCL 750.317; discharge of a firearm from a vehicle causing death, MCL 750.234a(1)(d); assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84(1)(a); and three counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced to serve concurrent terms of 25 to 50 years in prison for second-degree murder, 12 to 24 years in prison for discharge of a firearm from a vehicle causing death, and 18 months to 10 years in prison for AWIGBH, to be served consecutive to the three concurrent terms of two years in prison for felony-firearm. We affirm.

## I. FACTS

The general facts of this case are undisputed. At about 12:30 p.m. on October 27, 2022, Detroit Police Department Sergeant Lyons received information from one or more "shot spotter" microphones in Detroit that gunfire had occurred near "the area of Redmond and East State Fair." Sergeant Lyons promptly went to the scene and observed about six pistol casings "on Redmond just there at State Fair."[1] However, he did not observe any other items or persons of interest at the scene. Officer Borowski was directed to go to that scene to investigate, but while en route, he was redirected to "the area of Manning and Boulder" for "a body being placed out on the street." Officer Borowski went to that area and observed a body in the street with an apparent gunshot

---

[1] The casings were 9mm.

-1-

wound to the left upper back. His partner applied a "chest seal" to the wound, but after a few minutes, the officers could not detect a pulse.

John Ambry III was the primary prosecution witness, and he testified as follows. On October 27, 2022, Ambry III was a passenger in a white GMC SUV driven by his older brother, John Ambry II. The two brothers were casually driving around the neighborhood in the middle of the day "listening to music." At one point, the brothers briefly observed an orange Dodge Journey and, about five to 10 minutes later, they again observed the same vehicle traveling in the same direction. Under questioning at trial, Ambry III testified:

Q. And at the time you noticed it the second time is it behind you going in the same direction as you or coming in a different direction?

A. Behind me going in the same direction.

Q. And what happens next?

A. Then we was coming up on State Fair. We stopped. He went around us, went past us, blew through State Fair. Blew -- he drove through two stop signs and then turned around.

Q. And when you say, he, who exactly do you mean?

A. [Defendant.]

\* \* \*

Q. And what happened at that point?

A. Ah, he started shooting, raised his window down and started shooting while we was turning.

Q. And when you say, he started shooting, at what point -- at this point where is his vehicle in relation to yours?

A. Like across State Fair. We were turning onto State Fair. So he's like on the driver's side.

Q. And so was the orange Dodge going at the same direction or coming at you at the time of the shooting?

A. We was turning so he stopped, but we turned and then he just started shooting out the window.

Ambry III explained that his brother immediately "sped off," drove down about three blocks, turned onto Boulder, then "started driving a little slower." Ambry III continued:

My brother started driving a little slower, started slowing down and then, ah, he stopped -- stopped the car all the way. Then he looked up at the ceiling. I don't know, but then the car started rolling a little bit like real -- going real slow so then I just jumped -- I opened his door. I tried to push him -- I opened his door a little bit, tried to push him out a little bit, he so heavy, so my first instinct I somewhat dived over him or climbed over him out the car and then hurried up and pulled him out the car.

Ambry III said that by this point, he had lost sight of the Dodge Journey, so he drove about three or four blocks to retrieve his mother and return to the scene. When Ambry III and his mother arrived, "[w]e seen the police out there. He was laying on the ground." Ambry III estimated that he was at his home for about one or two minutes retrieving his mother.

Ambry III testified that during this sequence of events, neither he nor his brother rolled down their windows or had "any exchange of words" with defendant. He talked to the police about an hour after the shooting and identified a photograph of defendant as the shooter.

On cross-examination, Ambry III acknowledged that defendant, who lived on the same street, had "confrontations" with Ambry II about an ATV in August 2022. Apparently, defendant believed that Ambry II stole his ATV, and he wanted Ambry II to return it.

Dr. Nyugen, an assistant medical examiner for Wayne County, testified that Ambry II died from a single gunshot wound to the left upper back. This was consistent with the testimony of Corporal Fitzhugh, who testified that he inspected the GMC SUV after the shooting and identified a single bullet hole in "the window of the left rear door." He traced the bullet trajectory from that window to the "front of the driver's seat."

A forensic technician who participated in the execution of the search warrant at defendant's house testified that her partner photographed 9mm ammunition in the kitchen. She also acknowledged that there were "projectile marks" in the wall of the house facing the street.

Detective Mays testified that he interviewed defendant at police headquarters on October 27, 2022, after defendant waived his *Miranda* rights.[2] Detective Mays said that defendant was "[n]ot completely" forthcoming during the interview. The prosecution then played several minutes of the interview for the jury.

On the second day of trial, outside the presence of the jury, the parties argued over whether video recordings of two telephone calls made by defendant from jail after his arrest should be admissible. According to the prosecution, it provided those videos to defense counsel in discovery: "I have found an e-mail myself from August 1st telling him, hey, I just sent my evidence.com download link, DDC and Wayne County Jail calls, which would have included this one." Defense counsel disagreed, stating that "I asked the prosecutor to show me in the evidence.com link that

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

he sent me where these two videos are and he couldn't do it cause I didn't get them and he's trying to blind side me at the last second with videos that I never got." The prosecution responded that

> [u]nfortunately evidence.com at the time doesn't give me the ability to perform an audit log of a particular piece of evidence, only the overall packet, but in my August 1st email to [defense counsel] separately from that evidence.com I said, at this point I have sent the discovery in multiple dumps, Wayne County Jail and DDC communications by download link as well last week and this week. Please let me know if you have any difficulty with the download link or files.
>
> Not hearing any response to this sort of discovery that I enumerated I had sent I was under the impression it had been sent and received. . . .

The trial court ruled that it would not suppress the videos, reasoning as follows:

> All right. Based on the record that a bundle of evidence was sent by a link to [defense counsel] which included -- the People suggest included the videos and the report, referencing the videos, reports, that have been referenced by [defense counsel] in this trial corresponded to what was included in the more broader evidence.com link that the People suggest these other items were included in.
>
> In addition the prosecutor sent by e-mail a breakdown of what was included including reference to these videos and the report related to the videos combined with the fact that these videos have been reviewed by counsel.
>
> Now, at this point they're a matter of minutes long. They have been referenced in the exhibit list that's been at least presented to the Court as of yesterday so almost two full days.
>
> The Court finds that it's certainly not going to suppress or not allow the prosecutor to use this as evidence. I don't find there's been a prejudice as to [defense counsel or defendant], that is, and that [defense counsel] has had an opportunity to now review these videos and may cross-examine the witness with respect to those videos if he wishes. . . .

Wayne County Sheriff Deputy Solberg then testified about the videos. He explained that Wayne County Jail routinely records telephone calls made by inmates such as defendant and notifies the inmates that they are doing so. On November 6, 2022, defendant made two relevant telephone calls, both of which were played for the jury.[3]

---

[3] The videos were not provided to this Court as part of the electronic record. However, it is undisputed that, essentially, as defendant explains in his brief on appeal, "[i]n the calls, Appellant told the call recipients to get rid of a 'blick.' " A "blick" was defined earlier in trial as street slang for a firearm. During closing argument, the prosecution argued as follows:

Defendant's theory of the case was that he and Ambry II had an ongoing personal dispute during the few months preceding the shooting, and that he acted in self-defense on the day in question. In this regard, on cross examination, he elicited testimony from Officer Lloyd that, in the course of investigating the shooting, Officer Lloyd researched defendant's house through a "report management system search." That search showed that on August 9, 2022, defendant's house was identified as the subject of a shooting, with defendant himself identified as the victim. In other words, while not directly stated, Officer Lloyd indicated that on this date, someone shot at defendant's house. Officer Lloyd added that a police report dated August 25, 2022, apparently regarding the shooting on August 9, indicated that defendant identified "John" as the shooter.

Defendant testified on his own behalf. According to him, in late July or early August 2022, an ATV and a trailer in his backyard were stolen by Ambry II. Defendant made a police report and personally told Ambry II that he wanted his property returned. However, Ambry II "was mad because I was trying to get my property back and I went to the police about it," and about a month after the theft, Ambry II "started shooting at me." In particular, Ambry II shot at defendant's house, and the police investigated on a "shot spotter run." Shortly thereafter, Ambry II shot at defendant again, this time when defendant was "in front of the house." Defendant reported that incident to the police as well.

Defendant testified that at about noon on October 27, 2022, he was driving to meet a friend when Ambry II started following him. On direct examination, defendant explained:

---

The officers are like, hey, man, we want to find the gun, we don't want some little kid to get it on the street. You know what, I threw it in a sewer. I threw it down the sewer there. Well, those two jail calls, which were made on November 6th, the incident happened on October 27th, those two video calls made on November 6th, the first one with Rayvon Whitaker and he's telling him to go get something, something, and now he's speaking sort of, you know, in code.

He's being clever, but let's think about what exactly he asked him. It's something that's tucked up inside a piece of plastic in a car, okay. So maybe it's something small, all right, and then he's telling him to sell that bitch, okay. So maybe it's something worth money. This isn't something he just wants thrown out. Then he's telling him, you know, sell that bitch in another State, right. Okay. So it's something that is small. It's worth money, but he doesn't want it anywhere near here. He doesn't want it in the city of Detroit. He doesn't want it in the State of Michigan and in that second call with Miss Carswell, the conversation comes up about it being something to take apart, okay.

So it's something small, worth money, doesn't want it anywhere around here at that time and it can come apart and then when Miss Niyall (sic) Carswell goes, oh, so you're selling your Blick, what does he do? He goes, shh, right, puts his finger up to his mouth and has a sort of universal sign, stop talking.

Q.  How close was his car behind you?

A.  At first when I turned off of Eastburn that's when he did a U-turn and I was -- at that time I was driving the normal speed.  He got close to me.  I just kept driving straight and then when we got to Maddelein Street, his -- his street, that's when I seen him speed up, get in front of me and stop at his house.

Q.  All right. . . .  Now, did you actually see him go in his house or to the front of his house?

A.  He went to the front of his house and his ma was there at the front door.

Q.  And what did you see between his mother and John Ambry?

A.  I seen 'em exchange a weapon.

Q.  What type of weapon?

A.  A handgun.

Defendant said that "by the time I got to the corner he was back in the truck chasing me." Ambry II continued to chase defendant for several blocks, until defendant managed to temporarily escape:

A.  So basically when I was getting chased, ah, I got away from him.  I blew through a couple of stop signs.  I got away from him and then he ended up running back into me and I was on my way to my friend house on State Fair.

* * *

Q.  All right. . . .  Now, how soon after he got this gun did he put his car in front of your car?

A.  Um, about -- he didn't put his car in front of my car until -- until he chased me and then I got away from him and then we came to the -- we met up at the same intersection.  That was the next time we met up at the intersection of Redmond and State Fair.

Q.  Okay. . . .  And when you all met up at Redmond and State Fair what happened after that?

A.  There was a shooting at the corner of Redmond and State Fair.

Q.  All right. . . .  And what was going through your mind when the shooting happened?

A.  So I was scared, ah, I thought I was going to get shot at.  Then I just seen him go get his gun, the same dude that had been shootin' at me, stalking me

and basically he got to the corner. They was coming up State Fair and they blocked me off at the intersection.

On cross-examination, defendant acknowledged "giving the police officers a couple different versions of the events of October 27th," but he explained that he did so because "I didn't want to believe that John was dead at the time . . . ." Defendant also acknowledged that he falsely told the police that he dropped the firearm down a nearby storm drain after the shooting, but he explained that he did so because he wanted to reassure the police that no children would be able to obtain his firearm on the street. Defendant said that in reality, "after I was shooting the gun the gun fell out of the car and I pulled off. I didn't stop to get the gun." Finally, defendant acknowledged that on the day in question, he never saw the GMC SUV with a lowered window or any occupant of the vehicle extend a firearm toward him.

The parties presented closing arguments the following morning. That afternoon, the jury found defendant guilty as charged, and he was sentenced as noted above.

Defendant appealed and, in addition to the four-issue brief filed by his appellate counsel, he filed a Standard 4 brief as well. The Standard 4 brief, as amended, was accompanied by a motion to remand to the trial court for a *Ginther* hearing.[4] We denied the motion "without prejudice to a case call panel of this Court determining that remand is necessary . . . ." *People v Elliott*, unpublished order of the Court of Appeals, entered April 22, 2025 (Docket No. 369555).

## II. COUNSELED BRIEF ON APPEAL

### A. DISCOVERY VIOLATION

Defendant first argues that the trial court erred by allowing the prosecution to present recordings of his two telephone calls from jail concerning a "blick." According to defendant, these recordings were not timely provided to his counsel before trial, so the trial court should have precluded the prosecution from presenting these recordings to the jury. We disagree.

"We review a trial court's decision regarding the appropriate remedy for a discovery violation for an abuse of discretion." *People v Dickinson*, 321 Mich App 1, 17; 909 NW2d 24 (2017). "An abuse of discretion occurs when the trial court chooses an outcome that is outside the range of principled outcomes." *Id*. at 18.

"MCR 6.201 governs and defines the scope of criminal discovery in Michigan." *People v Greenfield*, 271 Mich App 442, 447; 722 NW2d 254 (2006). MCR 6.201 provides, in relevant part:

**(B) Discovery of Information Known to the Prosecuting Attorney.**
Upon request, the prosecuting attorney must provide each defendant:

---

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

-7-

\* \* \*

        (3) any written or recorded statements, including electronically recorded statements, by a defendant, codefendant, or accomplice pertaining to the case, even if that person is not a prospective witness at trial . . . .

\* \* \*

        **(J) Violation.** If a party fails to comply with this rule, the court, in its discretion, may order the party to provide the discovery or permit the inspection of materials not previously disclosed, grant a continuance, prohibit the party from introducing in evidence the material not disclosed, or enter such other order as it deems just under the circumstances. Parties are encouraged to bring questions of noncompliance before the court at the earliest opportunity. Willful violation by counsel of an applicable discovery rule or an order issued pursuant thereto may subject counsel to appropriate sanctions by the court. An order of the court under this section is reviewable only for abuse of discretion.

"There is no general constitutional right to discovery in a criminal case." *People v Elston*, 462 Mich 751, 765; 614 NW2d 595 (2000). Consequently, a prosecutorial violation of MCR 6.201 is subject to a harmless-error analysis. *Id*. at 765-766. That is, "[t]o obtain relief for a discovery violation, the defendant must establish that the violation prejudiced him or her." *Dickinson*, 321 Mich App at 17-18.[5]

Here, as the trial court discussed in its ruling, the prosecution sent defense counsel an e-mail before trial indicating that it had submitted "DDC and Wayne County Jail calls" that it expected to introduce at trial. At a minimum, even if those calls were inadvertently omitted or deleted from the "evidence.com download link" sent by the prosecution to defense counsel, defense counsel nonetheless had pretrial notice that the prosecution would be introducing telephone calls made by defendant when he was an inmate. Ideally, under such circumstances, defense counsel should have pursued the matter to obtain the telephone calls from the prosecution before trial. Moreover, defendant himself certainly had knowledge of the telephone calls before trial, as he was responsible for those calls. Compare *People v Taylor*, 159 Mich App 468, 487-488; 406 NW2d 859 (1987) ("In this case we find that defendant was entitled to no remedy for the prosecutor's nondisclosure of the letter in question since the defendant, having written it himself, had knowledge of it independent of discovery.").

Simply put, even assuming that the prosecution did not actually submit the telephone calls at issue in the "evidence.com download link," the trial court had the authority under MCR 6.201(J) to rule "as it deems just under the circumstances." Ruling that the telephone calls were barred from evidence would essentially reward defendant for the inadvertent error by the prosecution and

---

[5] A prosecutor's suppression of exculpatory evidence raises constitutional issues. See, e.g., *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). However, the evidence at issue was inculpatory, not exculpatory, so the *Brady* line of cases does not apply. See *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014).

defense counsel's failure to bring the matter to the prosecution's attention before trial. Further, defense counsel was able to review the telephone calls before the prosecution introduced them, and defendant has not articulated on appeal how his defense would have been different if the calls had been given to him before trial. Under these circumstances, the trial court did not err or abuse its discretion by ruling that the telephone calls were admissible.

## B. AWIGBH

Defendant next argues that the prosecution submitted insufficient evidence to prove that he was guilty of AWIGBH, and the accompanying count of felony-firearm, because "there was reasonable doubt whether Appellant had the required intent to cause Ambrey, III [sic] great bodily harm." We disagree.

"A claim that the evidence was insufficient to convict a defendant invokes that defendant's constitutional right to due process of law." *People v Lane*, 308 Mich App 38, 57; 862 NW2d 446 (2014). "This Court reviews de novo a defendant's challenge to the sufficiency of the evidence supporting his or her conviction." *Id*. "We review the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could find that the prosecution had proved the crime's elements beyond a reasonable doubt." *Id*. "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

"The elements of assault with intent to do great bodily harm less than murder are: (1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016) (quotation marks and citation omitted). "This Court has defined the intent to do great bodily harm as an intent to do serious injury of an aggravated nature." *Id*. (quotation marks and citation omitted). "Assault with intent to commit great bodily harm is a specific intent crime." *People v Parcha*, 227 Mich App 236, 239; 575 NW2d 316 (1997).[6]

It is undisputed that defendant and the Ambry brothers were at the same intersection when the shooting occurred. In fact, according to defendant, the victim's GMC SUV was so close to his Dodge Journey that it had "blocked [him] off at the intersection." From this testimony, a reasonable jury could infer that defendant was close enough to the GMC SUV to be able to view both of the Ambry brothers inside. Moreover, it is undisputed that defendant fired six or seven rounds at the GMC SUV, one of which fatally struck the driver, Ambry II, through the left rear window of the GMC SUV. A reasonable jury also could infer that because defendant fired numerous rounds at the GMC SUV, he attempted and intended to fatally harm not only the driver of that vehicle, but the passenger as well. In other words, while defendant himself testified that he

---

[6] Although the statute governing AWIGBH, MCL 750.84(1)(a), refers to "intent to do great bodily harm, less than the crime of murder," the particular absence of an intent to murder is not an element of the offense that must be proven beyond a reasonable doubt. See MI Crim JI 17.7. That is, the only intent necessary is the intent to do great bodily harm. See *People v Brown*, 267 Mich App 141, 148-150; 703 NW2d 230 (2005).

never observed Ambry III in the GMC SUV, there was sufficient evidence from which a jury could find that defendant was aware that Ambry III was in that vehicle, and that he attempted and intended to fatally harm Ambry III as well as Ambry II. This was sufficient to satisfy both elements of AWIGBH. See *Blevins*, 314 Mich App at 357.

Further, we note that even if defendant did not specifically attempt or intend to fatally harm Ambry III, we would still be compelled to affirm his conviction of AWIGBH. Under the doctrine of transferred intent:

> Before defendant can be convicted it must first be shown that he had the intention to cause great bodily harm to someone. Merely because he shot the wrong person makes his crime no less heinous. It is only necessary that the state of mind exist, not that it be directed at a particular person. [*People v Lawton*, 196 Mich App 341, 350-351; 492 NW2d 810 (1992) (quotation marks and citation omitted).]

Here, by firing six or seven rounds at the GMC SUV, a reasonable jury could have inferred that, at a minimum, defendant attempted and intended to cause great bodily harm to Ambry II. This state of mind transfers to Ambry III for the purposes of AWIGBH. See *People v Davis*, unpublished per curiam opinion of the Court of Appeals, issued June 29, 2023 (Docket No. 360300), at 9 ("[W]hen a defendant attempts to murder one person and, as a result, others are placed in reasonable apprehension of being inflicted by the same type of harm, the defendant's intent to kill transfers to all those whom are placed in such apprehension.").[7] For this additional reason, we affirm defendant's conviction of AWIGBH.

## C. SELF-DEFENSE

Relatedly, defendant argues that the prosecution failed to introduce sufficient evidence to disprove his theory of self-defense. We disagree. As with the previous issue, our review is de novo. See *Lane*, 308 Mich App at 57.

"With the enactment of the Self–Defense Act (SDA), MCL 780.971 *et seq*., the Legislature codified the circumstances in which a person may use deadly force in self-defense or in defense of another person without having the duty to retreat." *People v Dupree*, 486 Mich 693, 708; 788 NW2d 399 (2010). MCL 780.972(1)(a) of the SDA provides:

> An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if . . . [t]he individual honestly and reasonably believes that the use of deadly force is

---

[7] "Although MCR 7.215(C)(1) provides that unpublished opinions are not binding under the rule of stare decisis, a court may nonetheless consider such opinions for their instructive or persuasive value." *Cox v Hartman*, 322 Mich App 292, 307; 911 NW2d 219 (2017). Moreover, we note that while *Davis* concerned assault with intent to murder, its rationale in this regard applies with equal force to AWIGBH.

-10-

necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.

"Once a defendant satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist, the prosecution bears the burden of disproving the affirmative defense of self-defense beyond a reasonable doubt." *Dupree*, 486 Mich at 712. "In general, a defendant does not act in justifiable self-defense when he or she uses excessive force or when the defendant is the initial aggressor." *People v Guajardo*, 300 Mich App 26, 35; 832 NW2d 409 (2013).

In this case, the prosecution submitted sufficient evidence from which a jury could find that self-defense was disproven beyond a reasonable doubt. Ambry III testified that defendant started following them and, eventually, positioned himself at an intersection so he could fire several rounds at them from his driver's side window. He also testified, as defendant himself acknowledged on cross-examination, that neither of the Ambry brothers directly provoked defendant during the drive. Moreover, the fatal bullet that struck Ambry II entered through the left rear window, which was generally consistent with Ambry III's testimony that the Ambry brothers were trying to flee defendant, and suggests that when defendant was firing at the Ambry brothers, he was doing so from a position that was safe from harm. These facts, taken together, indicate that defendant did not have an honest or reasonable belief that the use of deadly force was necessary under the circumstances. See MCL 780.972(1)(a).

Defendant does not dispute the incriminating testimony from Ambry III or the incriminating trajectory of the fatal bullet. Instead, he highlights his own testimony that Ambry II had fired upon his house on at least two occasions in August 2022, that he observed Ambry II retrieve a handgun from his mother during the vehicle chase in dispute, and that he was in fear for his life at the time of the shooting. However, the jury was not required to accept this testimony, see *Nowack*, 462 Mich at 400, and defendant gave the jury ample reason to not do so. For instance, he admittedly told multiple stories to the police during the interview at police headquarters and told two people while an inmate at Wayne County Jail to dispose of a small object, which a jury may presume was likely the firearm used in the shooting. In addition, his testimony to the effect that Ambry II abruptly drove past him during the chase and stopped to retrieve a firearm while defendant was slowly driving down the street was undermined by the prosecution on cross-examination. The prosecution implied through its questioning of defendant, it is doubtful that, if defendant was correct that Ambry II was chasing him (and not vice versa), he would slowly drive down the street instead of quickly driving away to ensure his safety. Finally, while we acknowledge that defendant introduced some evidence beyond his own trial testimony indicating that Ambry II had fired upon his house on at least one occasion in August 2022, that fact would not, by itself, translate to an "imminent" threat in late October 2022, which is the standard required by MCL 780.972(1)(a).

For these reasons, the prosecution submitted sufficient evidence to disprove the claim of self-defense beyond a reasonable doubt.

### D. PROSECUTORIAL ERROR

-11-

Defendant argues that the prosecution erred during its closing argument by stating that defendant was "not willing to come all the way clean" during his interview with the police, and by stating that "I don't believe it's self-defense." We disagree.

"In cases alleging prosecutorial [error], issues are preserved by contemporaneous objections and requests for curative instructions." *People v Evans*, 335 Mich App 76, 88; 966 NW2d 402 (2020) (cleaned up). Here, defendant acknowledges that defense counsel did not object, so our review is for plain error. See *id*. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (cleaned up).

"The question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). Clear error occurs when "the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014) (quotation marks and citation omitted). "Nonetheless, because no *Ginther* hearing was held, our review is limited to mistakes apparent on the record." *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial [error] is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "Issues of prosecutorial [error] are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context." *Id*. at 64. Prosecutors "are free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case," but they should not "express their personal opinion of a defendant's guilt, and must refrain from denigrating a defendant with intemperate and prejudicial remarks." *People v Bahoda*, 448 Mich 261, 282-283; 531 NW2d 659 (1995) (cleaned up). "A prosecutor may argue from the facts that a witness is credible or that a witness is not worthy of belief. . . . [P]rosecutorial arguments regarding credibility are not improper when based on the evidence, even if couched in terms of belief or disbelief." *People v Unger*, 278 Mich App 210, 240; 749 NW2d 272 (2008).

Here, defendant challenges the following two italicized excerpts from the prosecution's closing argument. First, when discussing defendant's interview with the police and his telephone calls from jail, the prosecution stated:

> I'd suggest to you, ladies and gentlemen -- and you also heard from Officer Lloyd -- the Blick is slang for a firearm. I'd suggest to you, ladies and gentlemen, that even after telling those officers, after talking to 'em for four hours and eleven minutes he's still misleading them. *He's not willing to come all the way clean*.

He's telling 'em just enough so it aligns with what the other witnesses are telling him, what the evidence that they find in his house, what the photographs are, he's trying to tell 'em just enough so it makes sense, but even after all that he's still not telling you the full story. [Emphasis added.]

Second, when discussing defendant's claim of self-defense, the prosecution stated:

Ultimately despite all the testimony about this beef that may have been going on between these guys remember when I asked a couple of the witnesses, you know, how far is August from October, right? When you're judging whether something's self-defense it has to be an honest and a reasonable belief and if you're holding onto something from August at the end of October I'd suggest to you that that's not reasonable, that your explanation that -- the three, four different versions that he told officers in the interrogation, that's not honest and reasonable.

He was misleading them every step of the way until they confronted him. Here's the photograph of this. Here's the casing from the scene. Here's the same brand and caliber in your kitchen, right. It was only when he was checked on each of his misstatements, his attempts to mislead.

*For that reason I don't believe it's self-defense.* Ladies and gentlemen, I'd ask you to hold the Defendant accountable for his conduct on October 27th, 2022 and find him guilty of all counts. . . . [Emphasis added.]

Neither of the challenged statements were improper. The first statement, "[h]e's not willing to come all the way clean," was an appropriate commentary on the overall evidence and defendant's interview with the police in particular. When asked on cross-examination whether he "remember[ed] giving the police officers a couple different versions of the events of October 27th," defendant replied in the affirmative. The defendant acknowledged that he falsely told the police that he dropped his firearm down a nearby storm drain. Then, when asked why he provided that false statement to the police, defendant explained that he wanted to reassure the police that no children would be able to obtain his firearm. However, from the overall evidence, particularly the subsequent telephone calls from jail regarding a "blick," it was reasonable to infer that defendant lied to the police because the firearm was not yet discarded, and he did not want to police to search for it. Simply put, there is nothing inappropriate with the prosecution's argument that defendant was not willing to "come all the way clean" during his interview with the police, and no error occurred in this regard. See *Carines*, 460 Mich at 763. It follows that any objection by defense counsel would have been unavailing, and counsel cannot be deemed ineffective for failing to raise an unavailing objection. See *People v Putman*, 309 Mich App 240, 245; 870 NW2d 593 (2015).

As to the second statement, "I don't believe it's self-defense," that was an appropriate commentary on the overall evidence as well. In other words, the prosecution properly argued from the facts that defendant's claim of self-defense was not worthy of belief. See *People v Launsburry*, 217 Mich App 358, 361; 551 NW2d 460 (1996) ("A prosecutor may argue from the facts that a witness, including the defendant, is not worthy of belief . . . ."). As explained earlier, witness testimony and other evidence were not consistent with defendant's claim of self-defense. For instance, the fatal bullet that struck Ambry II entered near the rear of the vehicle, suggesting that

defendant was chasing the Ambry brothers, not vice versa, and that defendant was not in fear for his life at the time. Similarly, the inconsistent stories that defendant told the police during the interview also indicated that he did not legitimately act in self-defense at the time. See *People v Cowell*, 44 Mich App 623, 625; 205 NW2d 600 (1973) ("[C]onflicting statements tend to show a consciousness of guilt and are admissible as admissions."). Thus, no error occurred with regard to the second challenged statement, see *Carines*, 460 Mich at 763, and counsel was not ineffective for failure to object, see *Putman*, 309 Mich App at 245.

## III.  STANDARD 4 BRIEF

### A.  CELLULAR PHONE RECORDS

In his Standard 4 brief, defendant first argues that defense counsel was ineffective because he "failed to investigate and request that Defendant's cell phone which were [sic] seized by the police, however never dumped to see what evidence was on it. Defendant's phone records would have shed light on the fact that John Ambry II had previously threaten Defendant." We disagree.[8]

"Criminal defendants are entitled to the assistance of counsel under both the Michigan and United States Constitutions. Const 1963, art 1, § 20; US Const, Am VI. This right guarantees the effective assistance of counsel." *People v Yeager*, 511 Mich 478, 488; 999 NW2d 490 (2023). "In order to obtain a new trial because of ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that that outcome would have been different." *Id*. (quotation marks and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted). "The defendant has the burden of establishing the factual predicate of his ineffective assistance claim." *Douglas*, 496 Mich at 592.

Defendant has failed to sustain his burden on this issue. He has not identified anything in the lower-court record, nor has he provided any materials on appeal, to suggest that his cellular-phone records would have contained any exculpatory evidence such as threatening communications from Ambry II. In fact, defendant has not even explained the nature of these alleged threatening communications, e.g., whether these alleged threats included direct threats of harm, implied threats of harm, overall anger, or something else. Therefore, he is not entitled to relief for this issue. See *id*.

### B.  FAILURE TO IMPEACH

Defendant next argues that defense counsel was ineffective because he failed to impeach Ambry III in the following respects: (1) Ambry III testified at trial that he first noticed the Dodge

---

[8] One of the officers who arrested defendant at his house briefly testified that, when conducting a search incident to arrest, "I recovered a cellphone from his person as well, but I handed that over to the Homicide detectives so I didn't personally place that on evidence." There was no additional discussion of that cellular phone at trial. Simply put, as defendant observes, the police were in physical possession of his cellular phone at one point in time.

Journey travelling behind him in a different direction, while he testified at the preliminary examination that he first noticed the Dodge Journey "following us"; (2) Ambry III testified at trial that he initially identified defendant in the Dodge Journey but could not identify whether anyone else was present in that vehicle, while he testified at the preliminary examination that he did not observe anyone else besides defendant in the Dodge Journey; (3) Ambry III testified at trial that he did not attempt to provide medical aid to his brother, whereas he testified at the preliminary examination that he attempted to determine whether his brother was breathing before removing his brother from the vehicle; and (4) Ambry III testified at one point during the preliminary examination that he and his brother never turned onto State Fair, whereas he indicated at another point during the preliminary examination that they briefly drove on State Fair until "the next corner."[9] Defendant asserts that Ambry III committed perjury and that there is a reasonable probability that the outcome of trial would have been different had defense counsel properly impeached Ambry III.

We agree with defendant that, as a general proposition, "[c]ounsel may provide ineffective assistance if counsel unreasonably fails to develop the defendant's defenses by adequately impeaching the witnesses against the defendant." *Lane*, 308 Mich App at 68. However, minor discrepancies do not establish perjury. See *Schaffer v Beringer*, 842 F3d 585, 595 (CA 8, 2016); *United States v Scarfo*, 711 F Supp 1315, 1322 (ED Pa, 1989). In this case, each of the alleged inconsistences identified by defendant are either minor or essentially nonexistent. For example, Ambry III consistently testified that he and his brother were driving around the neighborhood when, at some point, defendant noticed and started following them. The particular direction in which defendant was initially driving is irrelevant for the facts of this case. Similarly, whether Ambry III initially observed any passengers in the Dodge Journey, whether checking on his brother's breathing constitutes medical assistance, and whether Ambry III and his brother momentarily drove on State Fair are not relevant issues. This is particularly true in light of the fact that some of the questions posed to Ambry III were not precise, which may have led him to provide a slightly different answer than what was intended or expected. Any attempt by defense counsel to raise these alleged impeachment issues at trial would have been unavailing. The record does not show that Ambry III committed perjury, that defense counsel should have exercised better diligence by raising these alleged impeachment issues at trial, or that attempting to impeach Ambry III in the manner suggested by defendant would have created a reasonable probability of a different outcome. Thus, we conclude that defendant has failed to establish both elements of his ineffective-assistance claim. See *Yeager*, 511 Mich at 488.

## C. FOURTH AMENDMENT

Finally, defendant argues that the police violated the Fourth Amendment by searching his house without obtaining a valid search warrant beforehand and, as a result, the incriminating 9mm ammunition found in his house should have been suppressed. Defendant asserts that the trial court

---

[9] Defendant identifies a few other alleged inconsistencies in his Standard 4 brief. However, the transcripts do not indicate the existence of such inconsistencies, and we will not catalogue them further.

plainly erred by admitting the ammunition or, alternatively, that defense counsel was ineffective for failure to object. We disagree.

"The Fourth Amendment of the United States Constitution and its counterpart in the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures." *People v Rodriguez*, 327 Mich App 573, 583; 935 NW2d 51 (2019) (quotation marks and citations omitted). "Ordinarily, searches conducted without a warrant are unreasonable." *Id.* "And, generally, when evidence has been seized in violation of the constitutional prohibition against unreasonable searches and seizures, it must be excluded from trial." *People v Mahdi*, 317 Mich App 446, 458; 894 NW2d 732 (2016) (quotation marks and citation omitted). Here, because defense counsel failed to object, our review is for plain error affecting substantial rights. See *Carines*, 460 Mich at 763.[10]

The two facts identified by defendant do not suggest, much less establish, that any Fourth Amendment violation occurred. The record shows that at 4:07 p.m. on October 27, 2022, Detective Mays obtained a waiver of *Miranda* rights from defendant before questioning him. The record also shows that at 4:42 p.m. on October 27, 2022, Sergeant Flanders received "approval to execute the search warrant" from a judge. There is nothing unusual about this sequence of events that would indicate any violation of the Fourth Amendment. Further, we note that there is nothing else in the record to reasonably indicate the possibility of a Fourth Amendment violation. To the contrary, a forensic technician testified that at approximately 6:00 p.m. on October 27, 2022, she assisted with the execution of a search warrant at defendant's house, which revealed, in relevant part, eight rounds of 9mm ammunition on the kitchen countertop. In other words, trial testimony indicates that the police first searched defendant's house about an hour after a judge approved the search warrant. Further, there is no argument or suggestion that the search warrant itself was invalid. Therefore, the trial court did not plainly err by admitting evidence of the incriminating 9mm ammunition in defendant's house, see *Carines*, 460 Mich at 763, nor was defense counsel ineffective for failure to object, see *Putman*, 309 Mich App at 245.[11]

## IV. CONCLUSION

---

[10] Arguably, this issue is waived because defense counsel affirmatively stated that he had no objection to admission of the photographs of the 9mm ammunition, but we will nonetheless address the merits under the plain-error standard.

[11] In his one-page affidavit accompanying his amended Standard 4 brief, defendant summarily asserts that "[t]he day that I was arrested the arresting officers entered the dwelling from the back entrance and began the search inside the home." However, even taking this allegation as true, defendant would not be entitled to relief because the only incriminating evidence found by the police was the 9mm ammunition in the kitchen. And, because defendant admitted to shooting at the GMC SUV while testifying, the fact that the police found ammunition consistent with the shooting in defendant's house could not have created any reasonable probability of a different outcome in this case. See *Carines*, 460 Mich at 763; *Yeager*, 511 Mich at 488.

None of the issues raised by defendant in his brief on appeal or his Standard 4 brief entitle him to relief.  Accordingly, we affirm.

/s/ Michael J. Riordan
/s/ Randy J. Wallace
/s/ Christopher M. Trebilcock